UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVSIION

| | |
|---|---|
| MISTI S. WAGNER,<br><br>　　Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　Defendant. | CASE NO. 3:17-CV-0310<br><br>JUDGE JAMES G. CARR<br><br><br>MAGISTRATE JUDGE<br>THOMAS M. PARKER<br><br>**REPORT & RECOMMENDATION** |

**I.　Introduction**

Plaintiff, Misti S. Wagner, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence supports the ALJ's decision and because Wagner has failed to identify any error of law in the ALJ's evaluation of her claim, I recommend that the final decision of the Commissioner be **AFFIRMED**.

**II.　Procedural History**

On July 17, 2013, Wagner filed concurrent applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") alleging disability beginning on December 27, 2012. (Tr. 214-221) The claims were denied initially on October 7, 2013 (Tr. 77-

104) and on reconsideration on April 4, 2014. (Tr. 107-135) Wagner requested a hearing on May 12, 2014. (Tr. 169-170)

Administrative Law Judge ("ALJ") K. Michael Foley heard the case on December 8, 2015. (Tr. 42-75) On January 20, 2016, the ALJ issued a decision finding Wagner not disabled. (Tr. 15-28) The Appeals Council denied Wagner's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6) Wagner instituted this action on February 5, 2017 seeking judicial review of that decision. (ECF Doc. 1)

**III.    Evidence**

    **A.    Personal, Educational and Vocational Evidence**

Wagner was born on February 7, 1970. (Tr. 214) She has a limited education and past relevant work as an assistant club manager. (Tr. 113, 128)

    **B.    Medical Evidence**[1]

Wagner suffered a heart attack and received inpatient hospital care from December 30, 2011 to January 14, 2012. (Tr. 292) Cardiac catheterization revealed 100% occlusion on the left anterior coronary artery and 90% occlusion of the right coronary artery. (Tr. 292, 302, 316) Wagner underwent a quadruple bypass surgery with coronary artery grafting. (Tr. 292) The hospital discharged Wagner in stable condition, with a restriction on her ability to engage in heavy lifting and driving. (Tr. 293)

On February 14, 2012, Wagner followed up with Ronald Pohl, M.D., one of the treating surgeons. Wagner denied any chest pain or shortness of breath. Dr. Pohl felt that Wagner was doing well and that she could return to work once she passed her stress test. (Tr. 1165) The

---

[1] Wagner defers to the facts stated in the ALJ's decision and has cited minimal medical evidence in her brief. ECF Doc. 12, Page ID# 1627-1628.

exercise stress test performed on February 21, 2012 resulted in a non-ischemic electrocardiographic response. However, Wagner demonstrated evidence of deconditioning and diminished exercise tolerance. (Tr. 409)

Wagner attended cardio rehabilitation in March and April 2012. (Tr. 449, 433) In March, she denied any lower leg pain while walking on the treadmill and she was able to increase her duration and pace. (Tr. 449) In April, she felt better than she had in a year; she had improved endurance, energy level and strength. She was able to do more around the house and walk her dog for thirty minutes a day. (Tr. 433)

On April 26, 2012, Wagner complained of burning in her legs. (Tr. 405) An arterial blood flow evaluation showed suspected left arterial stenosis. (Tr. 406) An echocardiograph showed ejection fraction[2] of 40%. (Tr. 407)

A CT scan of Wagner's abdominal aorta and lower extremities on June 8, 2012 showed plaque through the distal aorta and 50% stenosis of the SMA and renal arteries. (Tr. 779-780) A carotid ultrasound in July 2012 confirmed the diagnosis of peripheral vascular disease. Ronald McGee, M.D., Wagner's treating vascular surgeon, recommended an angiogram with possible stenting. (Tr. 1111-1114) On August 2, 2012, Wagner underwent an angiography and angioplasty of her subclavian arteries. (Tr. 824-826)

On August 16, 2013, Wagner complained of back pain and leg swelling. Dr. McGee recommended that Wagner have an angiogram of the left lower extremity with possible arthrectomy, angioplasty, and or stenting. (Tr. 1116) On August 29, 2012, Wagner underwent

---

[2] "Ejection fraction is a measurement of the percentage of blood leaving [the] heart each time it contracts." https://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286 (Last visited December 13, 2017)

this surgery. (Tr. 820-823) Following the procedure, Wagner's pain was markedly improved and she was walking better. (Tr. 1117)

On October 8, 2012, a left lower extremity arterial duplex evaluation showed no evidence of significant peripheral vascular disease and Wagner's left lower extremity arterial system appeared patent. (Tr. 910)

On March 3, 2013, a bilateral carotid ultrasound showed that Wagner had 30-39% plaque in her right carotid artery, and 80-99% high-grade stenosis in her left carotid artery. (Tr. 790-791) However, she denied chest pain, dizziness, fatigue, palpitations and shortness of breath during a follow-up evaluation on March 7, 2013. (Tr. 773) She was asymptomatic at a follow-up appointment on March 18, 2013. (Tr. 1121)

On March 27, 2013, Wagner underwent surgery for her left carotid artery stenosis. (Tr. 845-847) On April 3, 2013, a left lower extremity arterial duplex evaluation showed no evidence of significant stenosis in the left lower extremity. (Tr. 907) On June 12, 2013, a carotid ultrasound was negative for significant carotid artery stenosis. (Tr. 1303)

A carotid arterial duplex evaluation on October 28, 2013 showed mild plaque disease but no convincing evidence of carotid stenosis. (Tr. 1299-1300) A Doppler Ultrasound of Wagner's lower extremities returned normal results. (Tr. 1301-1302)

A transthoracic echocardiography on November 19, 2013 showed an estimated ejection fraction of 35-40%. (Tr. 1144) At a follow-up appointment on November 27, 2013, Wagner reported no new cardiac complaints. (Tr. 1153) A 30-day cardiac scan from December 30, 2013 to January 28, 2014 revealed no evidence of ventricular tachycardia. (Tr. 1319)

A carotid Doppler ultrasound on May 12, 2014 showed no significant change from the June 12, 2013 study. (Tr. 1296)

4

An arteriography and angiography on December 2, 2014 showed marked improvement of Wagner's vascular disease after her surgeries. (Tr. 1346)

On December 18, 2014, Wagner complained of chest pain, shortness of breath and palpitations. (Tr. 1315) Paul Anike, M.D., one of Wagner's treating cardiologists, recommended an ultrasound for reevaluation of ejection fraction and stress testing. (Tr. 1317-1318) A stress test on December 29, 2014 showed left ventricular ejection fraction of 33%. (Tr. 1329) A transthoracic echocardiography (TTE) was limited but ejection fraction was visually estimated to be 40-45%. (Tr. 1335)

A cardiac monitor worn by Wagner from January 16, 2015 to January 29, 2015 showed no evidence of ventricular tachycardia. (Tr. 1327)

On September 10, 2015, Wagner complained of chest pain and dyspnea. A stress test showed an "ejection fraction of 27% persistently dilated left ventricle, but moderate hypokinesis." (Tr. 1325) Gated SPECT imaging revealed submaximal thickening of the distal anterior apical and basolateral wall. The study concluded:

> Based on available information of stress imaging data, this study is abnormal. It does show the area of previous infarct and diminished left ventricular ejection fraction which suggests intermediate to high risk for myocardial event. Risk factor modification. Clinical correlation is suggested.

(Id.) However, a TTE performed on the same date returned a "visually estimated" ejection fraction of 40%. (Tr. 1320)

### C. Opinion Evidence

#### 1. Reviewing Physician – Bruce Mirvis, M.D. – October 2013

On October 2, 2013, reviewing state agency physician, Bruce Mirvis, opined that Wagner could perform light work, except that she could only stand/walk a total of 4 hours in an 8-hour workday. (Tr. 86-88)

5

### 2. Reviewing Physician – Lynne Torello, M.D. – April 2014

On reconsideration, reviewing state physician, Lynne Torello, M.D., reviewed Wagner's file on April 3, 2014 and affirmed the opinions of Dr. Mirvis. (Tr. 116-118)

### D. Testimonial Evidence

#### 1. Wagner's Testimony

Wagner offered the following paraphrased testimony at her ALJ hearing:

- Wagner was born on February 7, 1970. She is 5'5" and weighed 145 pounds. (Tr. 46)

- Wagner did not complete high school. (Tr. 47)

- She previously worked at the VFW as an assistant manager. (Tr. 47-48) In that position, she ordered items, cleaned, cooked and tended bar. She was required to lift boxes weighing 40 to 50 pounds and was on her feet most of the day. (Tr. 48) Wagner worked at the VFW for 18 years. (Tr. 67)

- Wagner's worst impairment was related to her heart. She had undergone four bypasses. She also had related problems with her legs. She had experienced swelling and had stents in her legs to help with blood flow. (Tr. 49-50, 62-63)

- Wagner also had asthma and used an inhaler. Extreme temperatures made it difficult for her to breathe. (Tr. 64) She previously smoked about a pack a day but quit one year before the hearing. (Tr. 50)

- Wagner also had depression and anxiety. She treated with her family doctor, who prescribed medication. (Tr. 50-51)

- Wagner took numerous medications. Her side effects included dry mouth and difficulty sleeping. (Tr. 54) Wagner also attributed her sleeping problems to leg pain and anxiety. (Tr. 56)

- Wagner estimated that she could walk for 10 minutes, stand for 10-15 minutes and sit for 15-20 minutes before needing to elevate her feet. (Tr. 54-55)

- Her grip strength was poor and she had trouble opening pill bottles. She felt that she was able to lift 10-15 pounds. (Tr. 55-56)

- Wagner lived in a mobile home. She drove approximately once a month. Her driving was limited due to poor vision. (Tr. 57)

6

- Wagner liked to read.  She did not exercise much.  She would walk for 10 minutes, weather permitting.  (Tr. 57-58)

- The man with whom Wagner lived did most of the cooking, washed the dishes, did the laundry and went grocery shopping.  He also worked and paid all the bills.  Wagner had no other source of income.  (Tr. 58-59, 61)

- Wagner was socially inactive; she occasionally went to the movies and liked to play cards.  (Tr. 60)

- Wagner was a recovering alcoholic but she was not currently drinking.  (Tr. 61)  She had periods of sobriety but continued to struggle with this disease.  (Tr. 66)  Drinking exacerbated her mental impairments.  But during periods of sobriety, Wagner's physical impairments remained the same.  (Tr. 67)

### 2. Vocational Expert – Brian Walmer

Brian Walmer, a vocational expert ("VE"), also testified.  (Tr. 69-74)

- Wagner's past work was considered to be an assistant club manager.  (Tr. 69)

- The VE was asked to consider a hypothetical individual of Wagner's age, education, and past work experience who could occasionally lift and carry up to 20 pounds, and frequently lift and carry up to 10 pounds.  She could stand and/or walk with normal breaks for a total of four hours in an eight hour workday and sit with normal breaks for a total of about six hours in an eight hour workday.  She could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl.  She could never climb ladders, ropes or scaffolds.  She could frequently balance.  She was required to avoid concentrated exposure to temperature extremes, fumes, odors, dust, gases and poor ventilation.  She was also required to avoid exposure to hazards such as dangerous moving machinery and unprotected heights.  (Tr. 70-71)

- Mr. Walmer testified that this individual would not be able to perform Wagner's past jobs, but she would be able to perform the jobs of small parts assembler, assembly machine tender, and unskilled cashier.  There were significant numbers of those jobs in the national economy.  (Tr. 71-72)

- Mr. Walmer did not believe that the hypothetical individual would be able to do any jobs if she were required to elevate her feet above heart level or to sit in a reclining position 10% of the day or more.  (Tr. 73)

- The VE testified that work would not be available to an individual who consistently missed one to two days each month.  Work would also be unavailable to those who were off task more than 10% of the workday.  (Tr. 73-74)

7

## IV. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . .[3]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, paraphrased as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of

---

[3] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

    performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V.    The ALJ's Decision

On January 20, 2016, the ALJ decided:

1. Ms. Wagner met the insured status requirements of the Social Security Act through December 30, 2017. (Tr. 22)

2. Wagner had not engaged in substantial gainful activity since December 27, 2012, the alleged onset date. (Tr. 23)

3. Wagner had the following severe impairments: substance abuse disorders; coronary artery disease status-post four-vessel coronary artery bypass grafting; chronic obstructive pulmonary disease; carotid artery disease post left carotid endarterectomy; peripheral vascular disease status-post stenting right lower extremity; depression; anxiety disorder; and alcohol abuse. (Tr. 23)

4. Wagner's impairments, including the substance use disorders, met listing sections 12.04 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 [20 CFR 404.1520(d) and 416.920(d)]. (Tr. 24)

5. If Wagner stopped the substance abuse, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, she would continue to have the following severe impairments: coronary artery disease status-post coronary bypass grafting (CABG); chronic obstructive pulmonary disease (COPD); carotid artery disease status-post left carotid endarterectomy; peripheral vascular disease status-post stenting right lower extremity. (Tr. 26)

6. If Wagner stopped the substance abuse, she would not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. (Tr. 28)

7. If Wagner stopped the substance abuse, she would be unable to perform past relevant work. (Tr. 33)

8. Wagner was born on February 7, 1970 and was 42 years old, defined as a younger individual age 18-49, on the alleged disability onset date. (Tr. 33)

9. Wagner had a limited education and was able to communicate in English. (Tr. 33)

10. Transferability of job skills was not material because Wagner was not disabled whether or not she had transferable job skills. (Tr. 34)

11. If Wagner stopped the substance abuse, there would be a significant number of jobs in the national economy that she could perform. (Tr. 34)

The ALJ determined that, because substance use disorder was a contributing factor to the determination of disability, Wagner had not been disabled at any time from the alleged onset date through the date of his decision. (Tr. 35)

## VI. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required unless the legal error is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

11

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

Wagner asserts two succinct arguments in this appeal. She first contends the ALJ erred in concluding she did not meet the requirements of Listing 4.02. She also contends the ALJ should have obtained an updated medical opinion or medical expert to interpret later-submitted medical evidence rather than interpret it himself.

### B. Listing 4.02

Wagner argues that she met or functionally equaled Listing 4.02. "At step three, an ALJ must determine whether the claimant's impairment 'meets or is equivalent in severity to a listed . . . disorder.'" *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009) (citing 20 C.F.R. § 1520(d)(2)). In doing so, an ALJ must compare medical evidence with the requirements for listed impairments at step three. *May v. Astrue,* 2011 U.S. Dist. LEXIS 88551, 11 WL 3490186, at *7 (N.D. Ohio 2011). If a claimant meets or equals the requirements of a listed impairment, then the claimant is considered conclusively disabled. *Rabbers,* 582 F.3d at 653 (citing § 404.1525(a)). However, it is the claimant's burden to show she meets or equals a listing impairment at step three. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999).

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue,* 2012 U.S. Dist. LEXIS 21930, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart,* 165 F. App'x 408, 411 (6th Cir. 2006)). However, the court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing

impairment decision." *Snoke*, 2012 U.S. Dist. LEXIS 21930, 2012 WL 568986, at *6; see also May, 2011 U.S. Dist. LEXIS 88551, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision.") The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 U.S. Dist. LEXIS 21930, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 F. App'x at 411).

Wagner does not really argue that there was no evidence supporting the ALJ's Listing 4.02 finding. Instead, she points to allegedly contradicting evidence – a September 10, 2015 stress test – which showed gated left ventricular ejection fraction of 27%. The summary report from that test also stated that it was "abnormal" and suggested an intermediate to high risk for myocardial event. (Tr. 1325) Wagner states that she exhibited chest pain and dyspnea during the stress test and that the transthoracic echocardiography report showed impaired relaxation compatible with diastolic dysfunction. (Tr. 1321) She argues that this evidence established that she met Listing 4.02 and that the ALJ erred in determining otherwise. ECF Doc. 12, Page ID# 1630-1631.

Listing 4.02(A) defines disabling chronic heart failure:

> 4.02 *Chronic heart failure* while on a regimen of prescribed treatment, with symptoms and signs described in 4.00(D)(2). The required level of severity for this impairment is met when the requirements in both A and B are satisfied.
> A. Medically documented presence of one of the following:
> 1. Systolic failure (see 4.00(D)(1)(a)(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
> 2. Diastolic failure (see 4.00(D)(1)(a)(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);
> AND
> B. Resulting in one of the following:

13

    1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or
    2. Three or more separate episodes of acute congestive heart failure within a consecutive 12—month period (see 4.00(A)(3)(e)), with evidence of fluid retention (see 4.00(D)(2)(b)(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00(D)(4)(c)); or
    3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:
    a. Dyspnea, fatigue, palpitations, or chest discomfort; or
    b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or
    c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00(D)(4)(d)) due to left ventricular dysfunction, despite an increase in workload; or
    d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 CFR Pt. 404, Subpt. P, App. 1.

    In considering Listing 4.02, the ALJ stated:

The claimant has not exhibited signs or symptoms consistent with Listing 4.02 chronic heart failure. The claimant's ejection fraction has been estimated above 30% consistently without evidence of diastolic failure (Exhibits 1F, 2F, 7F, 12F, 13F, 23F). The most recent stress test apparently revealed ejection fraction of 27%; however, this estimate was not consistent with prior or contemporaneous testing, including a transthoracic echocardiography (TEE) which showed an ejection fraction of 40%. Further, imaging of the heart at that time did not show a degree of systolic or diastolic failure consistent with Listing-level dysfunction (Exhibit 23F/2). Moreover, the claimant has not had three or more separate episodes of acute congestive heart failure within a consecutive 12-month period. There is no evidence of inability to perform an exercise tolerance test or other serious complications in the claimant's physical and cardiac-related functioning, consistent with the Listing. The claimant does exhibit cardiomegaly on chest x-rays but this was noted as stable (Exhibits 9F, 19F, 21F).

(Tr. 29)

Regarding paragraph (A) of Listing 4.02, the ALJ noted that Wagner's ejection fraction had been consistently estimated at above 30% with the exception of a single stress test. The ALJ further noted that a TEE performed on the same day as the stress test returned an estimated ejection fraction of 40%. These findings mirrored the record evidence and, therefore, provide substantial evidence supporting the ALJ's decision. Wagner has not argued otherwise. Nor has she cited any authority supporting her argument that a single ejection fraction reading below 30% requires an ALJ to reject several other ejection fraction readings or estimates that were above 30%. Here, as noted above, one of the ejection fraction estimates of 40% was made on the same day as the stress test showing ejection fraction of 27%. (Tr. 1320) Thus, Wagner cannot argue that all of the ejection fractions above 30% were outdated or stale. Rather, it appears that the ALJ, in his effort to consider all the medical evidence – something he was obligated to do – concluded that the 27% reading did not represent Wagner's true condition.

Moreover, even if Wagner met the paragraph (A) criteria for Listing 4.02, she has not shown that she met one of the criteria for paragraph (B). The ALJ expressly found that Wagner did not meet these criteria. In her brief, Wagner states that she "exhibited chest pain and dyspnea on a September 10, 2015 stress test." This statement suggests that Wagner is arguing that she met the criteria for subparagraph (B)(3)(a), requiring evidence of an "inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to: * * * a. Dyspnea, fatigue, palpitations, or chest discomfort." However, Wagner clearly completed the stress test; and, while the reason for the stress test was chest pain, the report does not otherwise indicate that Wagner was experiencing the symptoms listed in subparagraph (B)(3)(a). (Tr. 1325) Thus, Wagner has not shown that she met the criteria for paragraph (B) of Listing 4.02.

15

Wagner's argument also glosses over the other portions of the Listing 4.02 requirements which the ALJ addressed.  He found no other evidence of systolic or diastolic failure and no evidence of three or more separate episodes of acute congestive heart failure.  He also found no evidence of other serious complications in Wagner's physical and cardiac-related functioning, consistent with the Listing.  (Tr. 29)

Wagner has not identified any record evidence showing she met her burden of proof regarding all of the requirements of Listing 4.02.  She has not shown that the ALJ erred in his analysis of the ejection fraction readings and estimates, and she has not contested the ALJ's other findings on 4.02(A).  Nor has she shown that she met one of the criteria under 4.02(B).  I recommend that the court affirm the ALJ's decision at Step Three.

### C. Interpreting Medical Evidence Not Reviewed by a Medical Expert

Wagner also argues that the ALJ erred by interpreting medical data that had not been reviewed by a medical expert. ECF Doc. 12, Page ID# 1631-1632.  Wagner cites several cases in support of this argument.  *Mitsoff v. Comm'r of Soc. Sec.,* 940 F.Supp.2d 693, 702 (S.D. Ohio 2013); *Smiley v. Comm'r of Soc. Sec.,* 940 F.Supp.2d 592, 600-601 (S.D. Ohio 2013); *Williams v. Massanari,* 171 F.Supp.2d 829, 834 (N.D. Ill. 2001); *Simpson v. Comm'r of Soc. Sec.,* 344 Fed.App'x 181, 194 (6th Cir. 2009).  Yet in each of these cases, the ALJ erred in substituting his opinion in place of a treating physician or, in *Williams*, for that of a medical examiner.

Here, there was no opinion from a treating physician.  Thus, the ALJ did not substitute his opinion in place of the opinion of an individual whose opinion was entitled to controlling weight if consistent with the record.  Rather, he reviewed the medical evidence in the record as was required.  And, the state agency reviewing physicians were the only expert opinions in Wagner's record; the ALJ properly afforded them significant weight.  *Tyrpak v. Astrue,* 858

16

F.Supp.2d 872, 887 (N.D. Ohio 2012). Wagner cites no authority for her contention that an independent medical opinion was required in order to review additional medical records submitted after the state agency physicians reviewed her record. "There is no regulation or case law that requires the [ALJ] to reject an opinion simply because medical evidence is produced after the opinion is formed." *Mount v. Comm'r,* 2013 U.S. Dist. LEXIS 83358 at *29 (S.D. Ohio June 13, 2013); *Williamson v. Comm'r of Soc. Sec.,* 2013 U.S. Dist. LEXIS 10706 at *7 (S.D. Ohio Jan. 9, 2013). And here, there was relatively little expertise required to determine whether the ejection fraction estimates met the criteria for listing 4.02.

Although there is no evidence that Wagner ever made a request at her hearing that the ALJ consult a medical expert in order to review the additional records, her brief argues that remand is required for that purpose. ECF Doc. 12, Page ID# 1632. The primary function of a medical expert is to explain medical terms and the findings in medical reports in more complex cases in terms that the administrative law judge, who is not a medical professional, may understand. *See Richardson v. Perales*, 402 U.S. 389, 408, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1972). The Commissioner's regulations provide that an administrative law judge "may also ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 C.F.R. § 404.1527(f)(2)(iii). The Commissioner's operations manual indicates that it is within the administrative law judge's discretion whether to seek the assistance of a medical expert. HALLEX I-2-5-32 (September 28, 2005). "The primary reason an ALJ may obtain ME opinion is to gain information which will help him or her evaluate the medical evidence in a case, and determine whether the claimant is disabled or blind." *Id.*

17

The operations manual indicates that an administrative law judge "may need to obtain an ME's opinion" in the following circumstances:

- the ALJ is determining whether a claimant's impairment(s) meets a listed impairment(s);

    * * *

- the medical evidence is conflicting or confusing, and the ALJ believes an ME may be able to clarify and explain the evidence or help resolve a conflict;

- the significance of clinical or laboratory findings in the record is not clear, and the ALJ believes an ME may be able to explain the findings and assist the ALJ in assessing their clinical significance;

HALLEX I-2-5-34 (September 28, 2005). An administrative law judge's determination of whether a medical expert is necessary is inherently discretionary. *Simpson v. Commissioner of Social Security,* 344 Fed.App'x. 181, 2009 WL 2628355 (6th Cir. 2009) (unreported) at *8. An administrative law judge abuses his discretion only when the testimony of a medical expert is "required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations. See 20 C.F.R. § 416.1444." *Haywood v. Sullivan*, 888 F.2d 1463, 1467-68 (5th Cir. 1989). Because discretion is involved, we can remand only when there is reason to believe the ALJ abused his discretion by not enlisting the assistance of a medical expert.

The ALJ obviously did not believe that an updated opinion from a medical expert was necessary for Wagner's claim. The record does not weigh against that decision. The medical evidence showed several ejection fraction estimates above 30%. Indeed, even Wagner's counsel acknowledged that the ejection fractions were not quite to the listing level, but were very close at 35%. (Tr. 74) And the ALJ pointed to an ejection fraction estimate of 40%[4] from the same day

---

[4] Wagner argues that the ALJ's citation to a 40% ejection fraction was incorrect and the record showed that the ejection fraction estimate was 33%. While there is a December 2014 ejection fraction calculation of 33% in the record, (Tr. 1340) the ALJ's statement was not incorrect. An ejection fraction of 40% was

18

that an ejection fraction reading of 27% was obtained. Wagner has identified no evidence to suggest that a review of the updated records, taken as a whole, would have changed the state agency medical experts' opinions. As a result, we cannot conclude that the ALJ abused his discretion or otherwise erred by not obtaining an updated medical expert opinion on this claim.

The ALJ supported his finding at Step Three by substantial evidence in the record, and he correctly applied the agency's regulations in determining that Wagner's impairments did not meet or medically equal Listing 4.02. I recommend that the court affirm the ALJ's decision in regard to Wagner's second argument.

### D.     RFC Determination

In the Conclusion section of her brief, Wagner completely shifts gears, offering the new argument that the ALJ's Step Five determination was not supported by substantial evidence. It appears that this argument may have been included in error because Wagner has not identified any errors in the ALJ's Step Five analysis. Nor did this RFC argument appear in the identified legal issues at page 1 of Wagner's brief. ECF Doc. 12, Page ID# 1626. Nevertheless, the court notes that it is the ALJ, not a physician, who is responsible to determine a claimant's RFC based on the evidence as a whole. 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 416.946(c). The regulations require the ALJ to evaluate several factors in determining the RFC, including all medical evidence (not limited to medical opinion testimony) and the claimant's testimony. *See Henderson v. Comm'r,* 2010 U.S. Dist. LEXIS 18644, *7 (N.D. Ohio, March 1, 2010) citing, *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96-5p, 1996 SSR LEXIS 2, SSR 96-8p, 1996 SSR LEXIS 5. The final responsibility for deciding the RFC "is reserved to the Commissioner." 20 C.F.R. § 416.927(e)(2).

---

estimated on September 10, 2015, the same day as the stress test returned an ejection fraction estimate of 27%. (Tr. 1320, 1325)

In this case, the ALJ supported his RFC determination by citations to the medical evidence including the opinions of the state agency reviewing physicians.  (Tr. 29-33)  Wagner does not contend that the ALJ mishandled the medical evidence or medical opinions in the record in reaching the RFC determination.  Indeed, the ALJ's RFC finding is generally consistent with the only medical opinions in the record.  And the ALJ relied on VE testimony to support his determination that there were many jobs someone like Wagner could do.  (Tr. 70-72)  Thus, while it is unclear why this argument was included in the conclusion section of Wagner's brief, it does not appear that the ALJ erred at Step Five.

## VII. Recommendation

Substantial evidence supports the ALJ's decision in this action and Wagner has not identified any error of law.  I recommend that the final decision of the Commissioner be **AFFIRMED**, pursuant to 42 U.S.C. §405(g).

Dated: December 13, 2017

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See** *U.S. v. Walters***, 638 F.2d 947 (6th Cir. 1981).  See also** *Thomas v. Arn,* **474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**